IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| BENJAMIN TODD, | ) | Case No. 3:20-cv-1374 |
| | ) | |
| Plaintiff, | ) | JUDGE JACK ZOUHARY |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff, Benjamin Todd, seeks judicial review of the final decision of the Commissioner of Social Security, denying his application for supplemental security income ("SSI") under title XVI  of the Social Security Act.  This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b).  Because the Administrative Law Judge ("ALJ") failed to apply proper legal standards in evaluating the medical opinion evidence by inadequately explaining his reasons for finding Todd's treating and examining source opinions unpersuasive, I recommend that the Commissioner's final decision denying Todd's application for SSI be vacated and that Todd's case be remanded for further consideration.

**I.    Procedural History**

On February 26, 2018, Todd applied for SSI.  (Tr. 244-49).[1]  Todd alleged that he became disabled on March 1, 2017, due to "[b]ipolar with schizoaffective disorder." (Tr. 244,

---

[1] The administrative transcript appears in ECF Doc. 11.

Todd had twice previously applied for SSI and was denied benefits each time.  (Tr. 119).  The record contains, however, only the two most recent ALJ decisions.  (Tr. 72-86, 119-27).

269).  The Social Security Administration denied Todd's application initially and upon reconsideration.  (Tr. 132-49, 151-66).  Todd requested an administrative hearing.  (Tr. 185-87).  ALJ Earl Ashford heard Todd's case on May 9, 2019 and denied the claim in a May 23, 2019 decision.  (Tr. 72-86, 91-111).  On May 11, 2020, the Appeals Council denied further review, rendering the ALJ's decision the final decision of the Commissioner.  (Tr. 1-4).  On June 23, 2020, Todd filed a complaint to obtain judicial review.  ECF Doc. 1.

## II.    Evidence

### A.    Personal, Educational, and Vocational Evidence

Todd was born on September 24, 1985 and was 32 years old on the alleged onset date. (Tr. 132, 244).  He completed 11th grade in 2004.  (Tr. 270).  Todd had past relevant work as a laborer.  (Tr. 84, 270).

### B.    Relevant Medical Evidence

Between December 2013 and October 2018, Todd received treatment at Firelands Counseling Group from Kelly Sprout, MD.  *See* (Tr.342-52, 354-65, 375-417, 431-34).

On December 23, 2013, Todd presented to Firelands Counseling Group after having been hospitalized for losing his temper and destroying cinder blocks in the basement of his mother's house.  (Tr. 375).  He also reported suicidal and homicidal ideations at the time of admission. (*Id.*).  Dr. Sprout Diagnosed Todd with bipolar disorder, not otherwise specified and prescribed Zyprexa, Cogentin, and Celexa.  (*Id.*).  On July 7, 2014, Todd returned to Dr. Sprout after a second hospitalization for increasing auditory hallucinations and suicidal ideations.  (Tr. 380). At the hospital, they discontinued Celexa, started him on Zoloft, and increased his Zyprexa dosage.  (*Id.*).  Dr. Sprout diagnosed Todd with bipolar disorder, not otherwise specified and prescribed medication consistent with the hospital prescriptions.  (*Id.*).

Between July 7, 2014, and October 12, 2015, Todd repeatedly reported "doing okay," with no adverse symptoms. *See* (Tr. 380, 382-83, 385-86, 388, 390, 392). His medication regiment changed to Seroquel, Latuda, and Zoloft. (*Id.*). On January 11, 2016, Todd stated that he had not been taking his medications and reported mood swings, depression, low energy, and poor concentration. (Tr. 394). Notably, he broke his toe kicking his sister's door because he got mad at her. (*Id.*). Dr. Sprout repeated Todd's bipolar diagnosis and continued medication. (*Id.*).

On April 19, 2016, Todd reported continued mood swings and anger issues, stating that he broke a window because he was mad at being told who he could and could not have over at his apartment. (Tr. 396). He also reported poor concentration but had okay energy and no psychotic symptoms. (*Id.*). Dr. Sprout repeated Todd's bipolar diagnosis and increased his Latuda dosage. (*Id.*).

On July 19, 2016, Todd reported that he was hospitalized for his mood swings but was stable post-hospitalization. (Tr. 398). He was sent home with Zoloft and Trileptal. (*Id.*). He also indicated that his concentration was fair and reported no psychotic symptoms. (*Id.*). Dr. Sprout reiterated Todd's bipolar diagnosis and continued his medication. (*Id.*).

On October 10, 2016, Todd indicated that he had been hospitalized in September 2016 "secondary to homicidal ideations" but was stable post-hospitalization. (Tr. 399). He had stopped taking his medication but stated that he was living with his mother, who made him take them. (*Id.*). His concentration and energy were "okay," and he denied psychotic symptoms. (*Id.*). Dr. Sprout reiterated his diagnosis, noting medication noncompliance. (*Id.*).

On November 7, 2016, Todd told Dr. Sprout he was "doing well" and still living with his mother. (Tr. 401). His concentration was fair, he denied psychotic symptoms, and he requested

something for his sleep.  (*Id.*).  Dr. Sprout continued Seroquel and Zoloft and prescribed trazodone for his sleep. (*Id.*).

On January 16, 2017, Todd reported an increase in auditory and visual hallucinations, as well as increased mood swings and irritability.  (Tr. 402).  He also reported working a third-shift job.  (*Id.*).  Dr. Sprout diagnosed Todd with bipolar disorder, unspecified with psychosis and increased his Seroquel dosage, continued Zoloft, and discontinued trazodone.  (*Id.*).

 On February 13, 2017, Todd indicated that he had a reaction to his medication that resulted in an emergency room visit.  (Tr. 404).  He expressed concern over his mood swings and anger.  (*Id.*).  He had been thrown out of the partial hospitalization program, his sleep was variable, his energy was high at times, his concentration was poor, and he had some paranoia. (*Id.*).  Dr. Sprout reiterated Todd's bipolar with unspecified psychosis diagnosis, continued Seroquel and Zoloft, and added Depakote.  (*Id.*).

On March 21, 2017, Todd reported doing well, with stable mood and no adverse symptoms.  (Tr. 406).  His energy was okay and his concentration fair.  (*Id.*).  Dr. Sprout changed his diagnosis to bipolar disorder, unspecified with psychosis, improved and continued medication.  (*Id.*).

On May 8, 2017, Todd reported low energy but stable mood and no psychotic symptoms. (Tr. 407).  His concentration was "okay."  (*Id.*).  Dr. Sprout diagnosed him with bipolar disorder, unspecified with psychosis, discontinued Depakote, and continued Zoloft and Seroquel.  (*Id.*).

On December 11, 2017, Todd reported "doing okay."  (Tr. 409).  He started living with his mother again, his mood was "okay," his energy was low, his concentration was fair, and he denied psychotic symptoms.  (*Id.*).  Dr. Sprout diagnosed him with bipolar disorder, unspecified with psychosis, improved and continued medication.  (*Id.*).

4

On March 5, 2018, Todd stated that that he was having "a little more mood swings," excessive sleep, and some paranoia.  (Tr. 410).  Dr. Sprout diagnosed him with bipolar disorder, unspecified, continued Zoloft and Depakote, decreased his Seroquel dosage, and started him on Rexulti.  (*Id.*).

On April 2, 2018, Todd indicated that he had been hospitalized for cutting his arm with a chainsaw, though Dr. Sprout noticed no scars on his arm.  (Tr. 411).  He reported a "little paranoia" and poor concentration but was "doing well."  (*Id.*).  His energy was "okay" and concentration poor.  (*Id.*).  Dr. Sprout reiterated his bipolar diagnosis, increased his Depakote dosage, continued Zoloft and Seroquel, and continued Saphris – which had been added at the hospital to replace Rexulti.  (*Id.*).

On August 4, 2018, Todd indicated that he had been arrested after getting into a fight and had stopped Seroquel because of weight loss.  (Tr. 413).  He reported a little paranoia, poor concentration, "okay" energy, and no psychotic symptoms.  (*Id.*).  Dr. Sprout reiterated Todd's diagnosis, increased his Depakote dosage, continued Zoloft and Saphris, and discontinued Seroquel.  (*Id.*).

On August 20, 2018, Todd indicated that he continued to have mood swings, but they were milder.  (Tr. 415).  He also continued to have poor concentration but reported no paranoia. (*Id.*).  Dr. Sprout diagnosed him with bipolar disorder, unspecified improved, continued his Depakote and Zoloft, and increased his Saphris dosage.  (*Id.*).

On October 1, 2018, Todd reported "doing better," with normal energy, good concentration, and no psychotic symptoms or side effects.  (Tr. 416).  He also denied psychotic symptoms or medication side effects.  (*Id.*).  Dr. Sprout diagnosed him with bipolar disorder, unspecified, and continued his medication.  (*Id.*).

5

On March 31, 2019, Todd was admitted to Clear Vista Health and Wellness after he presented to the emergency room with suicidal ideation.  (Tr. 442, 445).  He also reported hearing voices telling him to hurt himself and people around him and visual hallucinations.  (Tr.445).   He had spent 15 days in jail for unpaid child support, during which he was not given medication.  (Tr. 442).  He had increased instability, suicidal ideation, homicidal ideation, and vague occasional auditory hallucinations.  (*Id.*).  Upon examination, Todd reported poor motivation, concentration, attention, significant mood instability, and increased agitation.  (*Id.*).  His homicidal ideation resolved after leaving jail.  (*Id.*).  Todd was diagnosed with bipolar disorder, current episode depressed, severe with psychotic features.  (Tr. 444).

Todd was discharged on April 5, 2019, in stable condition.  (Tr. 518).  The discharge report stated that Todd appeared to be at "his baseline functional status.  He is able to return to the community and care for himself."  (*Id.*).  His discharge medications were Zyprexa, Wellbutrin, and Depakote.  (Tr. 519).

### C.    Relevant Opinion Evidence

#### 1.    Examining Psychologist – Richard Litwin, Ph.D.

On June 21, 2017, Richard Litwin, Ph.D. conducted a neuropsychological evaluation of Todd.  (Tr. 335-40).  On interview, Todd stated that he had been diagnosed with ADHD as a child, "can't concentrate," was easily overwhelmed, and lost interest quickly.  (Tr. 335).  He had also been diagnosed with bipolar disorder.  (*Id.*).  Todd was prone to self-isolation, paranoia, and manic periods.  (*Id.*).

Upon evaluation, Dr. Litwin diagnosed Todd with schizoaffective disorder (paranoia and bipolar symptoms, ADHD unspecified, and reading disorder.  (Tr. 339).  Dr. Litwin made the following findings:

Benjamin has solid low average IQ with weakness in abstract reasoning, spatial information synthesis, and processing speed.  There are prominent symptoms of ADHD with strong inattentive features made worse by chronic mental illness.  Benjamin struggles with focusing, organization and is prone to become overwhelmed easily.  He may respond impulsively and not use feedback effectively to discern alternative solutions to problems effectively.

Aptitude testing found strong evidence of phonological dyslexia with poor command of phonics.  This was especially evident on a spelling task.  Word reading and spelling was limited to simple vocabulary mostly involving one syllable.  Reading for comprehension was not an area of strength due to trouble reading words correctly and grasping vocabulary meaning.  Writing samples were limited to use of very simple words.  Command of basic math operations did not exceed basic literacy.

Emotionally, Benjamin remains highly symptomatic.  Despite years of treatment, he remains very depressed, prone to manic episodes, paranoid and is hearing voices.  He has trouble with emotional regulation and self soothing.  His medications do not appear to be offering optimal symptom relief.

Benjamin is prone to become overwhelmed easily and has shallow frustration tolerance.  He reported having problem with temper outburst and not trusting easily due to his paranoia.

(*Id.*).

Based on those findings, Dr. Litwin opined

Benjamin's ability to work and manage his symptoms around others appears highly guarded.  I am not confident that he is employable.  Even with simple tasks his work speed will likely be slow and there may be trouble staying on task and focusing sufficiently to complete an assignment.  Working around others will likely also be problematic given his paranoia.

I would encourage Benjamin to work with his mental health treatment to try and optimally stabilize his symptoms.  Benjamin also needs more opportunities to demonstrate less isolation and more community integration successes.  Volunteering may be a useful tool to allow for … low stress work opportunities to occur while having maximum flexibility to monitor and address his symptoms for the near future.  If Benjamin were able to volunteer successfully for several months, he may be in a much better place to consider competitive employment.  Any work setting will need to be low stress, high[ly] supportive and respect Benjamin's ongoing issues with ADHD and learning limitations.

(Tr. 340).

7

### 2. Treating Psychiatrist – Kelly Sprout, MD

On February 12, 2019, Dr. Sprout prepared a "Mental Residual Functional Capacity Assessment." (Tr. 432-34). She indicated that she began treating Todd on September 28, 2012 and had seen him on a frequency of one to three months apart. (Tr. 432). Dr. Sprout reported Todd's diagnosis as bipolar disorder, for which he had a poor response to treatment with continued episodes of severe depression, mood swings, and psychotic symptoms (paranoia). (*Id.*). His ability to sustain an eight-hour workday was "poor due to mood instability, anxiety and paranoia." (*Id.*). And he would be "[a]bsent more than 50% of the time due to anxiety, mood instability, psychosis." (Tr. 433).

Dr. Sprout opined that Todd was extremely limited in his ability to: (1) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; (2) sustain an ordinary routine without special supervision; (3) work in coordination with or proximity to others without being distracted; (4) complete a normal workday and workweek without interruptions and perform at a consistent pace without an unreasonable number and length of rest periods; (5) interact appropriately with the general public; (6) accept instructions and respond appropriately to criticism; (7) get along with coworkers or peers without distracting them or exhibiting behavioral extremes; (8) maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; (9) respond appropriately to changes in the work setting; and (10) set realistic goals or make plans independently of others. (Tr. 433-34).

Dr. Sprout refused to comment on Todd's ability to remember locations and work-like procedures and understand, remember, and carry out very short and simple instructions because they had not been tested. (Tr. 433). She also declined to comment on the percentage of the day that Todd would be off task because, while he reported poor concentration, it had not been

tested.  (Tr. 432).  Dr. Sprouts stated that Todd's limitations were present since she first saw him in 2012.  (Tr. 433).

**D.    The ALJ's Decision**

On May 23, 2019, the ALJ issued a written decision denying Todd's claim.  (Tr. 72-86).

The ALJ made the following paraphrased findings relevant to Todd's arguments in this case:

> 4.  Todd had the residual functional capacity ("RFC") to perform a full range of work at all exertional levels except no climbing of ladders, ropes or scaffolds; frequent use of the left upper extremity for handling, fingering, and feeling; and no exposure to hazards, such as dangerous moving machinery and unprotected heights.  Todd was additionally limited to simple, routine, and repetitive tasks in a work environment free from fast paced production requirements, such as moving assembly lines and conveyor belts, involving only work-related decisions, with few if any work place changes, and frequent interaction with the general public, coworkers, and supervisors.  (Tr. 79).

> The ALJ noted that under *Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837 (6th 1997), he was bound by the previous ALJ's findings and determinations relevant to Todd's RFC because he found that there was no new and material evidence that would warrant a change from the previous RFC.  (*Id.*).

> In evaluating the medical opinion evidence, the ALJ stated that it would not defer or give any specific evidentiary weight to any prior administrative medical finding or medical opinion.  (Tr. 82).

> The ALJ found Dr. Litwin's opinion not persuasive.  "The doctor apparently relied quite heavily on the subjective report of symptoms and limitations provided by the claimant, and seemed to uncritically accept as true most, if not all, of what the claimant reported without verifying it against the medical record. Furthermore, statements that the doctor was 'not confident that the claimant is employable,' working 'will likely also be problematic,' and 'there may be trouble staying on task' lacks the specificity which might otherwise make it more convincing."  (*Id.*).

> Dr. Sprout's opinion also was not persuasive.  "The possibility always exists that a doctor may express an opinion in an effort to assist a patient with whom he or she sympathizes for one reason or another.  Another reality which should be mentioned is that patients can be quite insistent and demanding in seeking supportive notes or reports from their physicians, who might provide such a note in order to satisfy their patients requests and avoid unnecessary doctor/patient tension.  While it is difficult to confirm the presence of such motives, they are

more likely in situations where the opinion in question departs substantially from the rest of the evidence of record, as in the current case."  (Tr. 82-83).

5.  Todd could perform his past relevant work as a laborer.  Alternatively, there were a significant number of jobs in the national economy which he could perform, such as cleaner, material handler, and sorter.  (Tr. 84-85).

Based on these findings, the ALJ determined that Todd was not disabled.  (Tr. 86).

## III.    Law & Analysis

### A.    Standard of Review

The court reviews the Commissioner's final decision to determine whether it was supported by substantial evidence and whether proper legal standards were applied.  42 U.S.C. § 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).  "Substantial evidence" is not a high threshold for sufficiency.  *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).  "It means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Id.* (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  Even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision still cannot be overturned "'so long as substantial evidence also supports the conclusion reached by the ALJ.'"  *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. Aug 7, 2020) (quoting *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003)).  Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence.  *Jones*, 336 F.3d at 476.  And "it is not necessary that this court agree with the Commissioner's finding," so long as it meets this low standard for evidentiary support.  *Rogers*, 486 F.3d at 241; *see also Biestek v. Comm'r of Soc. Sec.*, 880 F.3d 778, 783 (6th Cir. 2017) ("It is not our role to try the case de novo." (quotation marks omitted)).  This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without being second-guessed by a court.  *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless.  *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error.").  Furthermore, the court will not uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-CV-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue*, No. 2:10 CV 017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-CV-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010).  Requiring an accurate and logical bridge ensures that a claimant, as well as a reviewing court, will understand the ALJ's reasoning.

The Social Security regulations outline a five-step process the ALJ must use to determine whether a claimant is entitled to benefits: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of his RFC; and (5) if not, whether, based on the

claimant's age, education, and work experience, her can perform other work found in the national economy.  20 C.F.R. § 404.1520(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006).  Although it is the Commissioner's obligation to produce evidence at Step Five, the claimant bears the ultimate burden to produce sufficient evidence to prove that she is disabled and, thus, entitled to benefits.  20 C.F.R. § 404.1512(a).

### B.    Step Four: Weighing of the Medical Opinion Evidence

Todd argues that the ALJ failed to apply proper legal standards and reach a decision supported by substantial evidence when he found Dr. Sprout's and Dr. Litwin's opinions not persuasive.  ECF Doc. 12 at 10-13.  Todd argues that it was error for the ALJ to speculate that Dr. Sprout's opinion was given to assist Todd out of sympathy or at Todd's insistence.  ECF Doc. 12 at 12.  He argues that Dr. Sprout's opinion was supported by her treatment notes and, further, was consistent with Dr. Litwin's opinion.  *Id.*  Todd argues that the ALJ's reasons for discounting Dr. Litwin's opinion dismissed his education, training, and experience, and the fact that Dr. Litwin's opinion was supported by test results and his observations of Todd.  ECF Doc. 12 at 13.  He argues that Dr. Litwin's opinion was quite specific that he would have slow work speed and trouble staying on task, focusing, and working around others.  *Id.*  Thus, Todd argues, the ALJ failed to adequately evaluate Dr. Sprout's and Dr. Litwin's opinions.  *Id.*

The Commissioner responds that substantial evidence supported the ALJ's evaluation of Dr. Sprout's and Dr. Litwin's opinions.  ECF Doc. 14 at 8-13.  The Commissioner argues that the ALJ reasonably found that Dr. Sprout's opinion was not persuasive because her extreme limitations were inconsistent with her treatment record.  ECF Doc. 14 at 10-11.  For the same reasons, the Commissioner argues that the ALJ reasonably found Dr. Litwin's opinion unpersuasive.  ECF Doc. 14 at 12.  The Commissioner additionally notes that Dr. Litwin's

statements regarding Todd's employability were properly discounted as inconsistent with the medical evidence. ECF Doc. 14 at 12-13.

Todd did not file a reply brief. *See* Dkt. for Case No. 3:20-cv-1374.

### 1. Medical Opinion Evaluation Standard

At Step Four of the sequential analysis, the ALJ must determine a claimant's RFC by considering all relevant medical and other evidence. 20 C.F.R. § 404.1520(e). On January 18, 2017, the Social Security Administration amended the rules for evaluating opinion evidence for claims filed on or after March 27, 2017. *See Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5844 (Jan. 18, 2017). The new regulations provide that the Social Security Administration "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s)." 20 C.F.R. § 404.1520c(a). Nevertheless, an ALJ must "articulate how [he] considered the medical opinions and prior administrative medical findings" in adjudicating a claim. 20 C.F.R. § 404.1520c(a). In doing so, the ALJ is required to explain how he considered the supportability and consistency of a source's medical opinion(s), but generally is not required to discuss other factors. 20 C.F.R. § 404.1520c(b)(2). If the ALJ finds that two or more medical opinions "are both *equally well-supported and consistent* with the record but are not exactly the same," the ALJ must articulate what factors were most persuasive in differentiating the opinions. 20 C.F.R. § 404.1520c(b)(3) (internal citations omitted) (emphasis added). Other factors include: (1) the length, frequency, purpose, extent, and nature of the source's relationship to the client; (2) the source's specialization; and (3) "other factors," such as familiarity with the disability program and other evidence in the record. 20 C.F.R. § 404.1520c(c)(3)-(5). Consistency concerns the degree to which the opinion reflects the same limitations described in evidence from other

sources, whereas supportability concerns the relevancy of objective medical evidence and degree of explanation given by the medical source to support the limitations assessed in the opinion. *See* 20 C.F.R. § 404.1520c(c)(1)-(2).

### 2.    Dr. Sprout

The ALJ failed to apply proper legal standards in expressing his evaluation of Dr. Sprout's opinion.  The ALJ's determination that Dr. Sprout's opinion was unpersuasive appears to be based upon a finding that her opinion was "substantially" inconsistent with the medical evidence, from which the ALJ inferred Dr. Sprout's possible motives in rendering such an "inconsistent" opinion.  (Tr. 83).  This reasoning is problematic because it contains no explanation for why or how Dr. Sprout's opinion was inconsistent with the record evidence.  20 C.F.R. § 404.1520c(b)(2).  Also missing is any discussion on the supportability of Dr. Sprout's opinion.  *Id.*; (Tr. 83).  While one could argue that a motive to give more extreme limitations suggests that the opinion was not supported by objective medical evidence, supportability depends on the reasons actually given by the medical source, not those the ALJ imputes on her. 20 C.F.R. § 404.1520c(c)(1).

The ALJ's terse reasoning failed to build an accurate and logical bridge between the evidence and his conclusion that Dr. Sprout's opinion was substantially inconsistent with the medical record.  *Fleischer*, 774 F. Supp. 2d at 877.  And the error is not harmless because, without fuller explanation, this court cannot engage in meaningful review of the ALJ's decision. *Blakley*, 581 F.3d at 409.  The fact that the ALJ's ultimate conclusion may be supported by substantial evidence, is not enough.  *See id.* at 410 (stating that substantial evidence is no excuse to non-compliance with 20 C.F.R. § 404.1527(d)(2)).  Further, the ALJ's statements suggesting that Dr. Sprout had an improper motive to issue her opinion have no basis in the record and are

similar to those courts have repeatedly criticized as an improper basis upon which to discount a medical opinion.  *E.g.*, *Scales v. Comm'r of Soc. Sec.*, No. 1:19-cv-3, 2020 U.S. Dist. LEXIS 29280, at *42 (N.D. Ohio Feb. 20, 2020) ("The ALJ's speculation as to a doctor's possible motives for rendering a medical opinion is unsupported and is an impermissible ground for rejecting Dr. Tegtmeier's opinion."); *Carney v. Berryhill*, No. 1:16-cv-2136, 2017 U.S. Dist. LEXIS 99311, at *37 (N.D. Ohio June 9, 2017) (While … it is *possible* that Dr. Gross formed her opinion in order to appease a patient for whom she had sympathy, this Court's review is not guided by what is possible [but] [r]ather … whether the ALJ's decision is supported by *substantial evidence … contained in the record.*" (emphasis in original)); *see also Soto-Rivera v. Comm'r of Soc. Sec.*, No. 17-cv-6675, 2019 U.S. Dist. LEXIS 109125, at *14 (W.D.N.Y. June 28, 2019) ("This gratuitous finding is not only unsupported anywhere in this record, but also unfairly denigrates the entire medical profession.").

Because the ALJ's discussion for why he found Dr. Sprout's opinion unpersuasive was inadequate, I recommend that this matter be remanded so that the ALJ can provide a more appropriate and detailed explanation as to why he found her opinion unpersuasive.

### 3.    Dr. Litwin

The ALJ similarly failed to apply proper legal standards in evaluating Dr. Litwin's opinion.  The ALJ's reasons for finding Dr. Litwin's opinion unpersuasive were: (i) that it based on Todd's subjective complaints and (ii) that the opinion were insufficiently specific.  (Tr. 82).  Absent from the ALJ's evaluation of Dr. Litwin's opinion is any discussion of how he evaluated the consistency of Dr. Litwin's opinion with the record evidence.  20 C.F.R. § 404.1520c(b)(2).

The ALJ's determination that the opinion was based on Todd's subjective complains is a critique of the supportability of Dr. Litwin's opinion.  20 C.F.R. § 404.1520c(c)(1).  And that

critique ignored the fact that Litwin himself cited the various diagnostic testing he performed on Todd.  But even if those tests had not been done, a critique that rejects the opinion of a psychological source because it relied on a patient's report of symptoms that would be an improper basis upon which to discount the opinion.  The Sixth Circuit has recognized:

> [A] psychiatric impairment is not as readily amenable to substantiation by objective laboratory testing as a medical impairment … consequently, the diagnostic techniques employed in the field of psychiatry may be somewhat less tangible than those in the field of medicine…. In general, mental disorders cannot be ascertained and verified as are most physical illnesses, for the mind cannot be probed by mechanical devices in order to obtain objective clinical manifestations of medical illness…. [W]hen mental illness is the basis of a disability claim, clinical and laboratory data may consist of the diagnosis and observations of professionals trained in the field of psychopathology.  The report of a psychiatrist should not be rejected simply because of the relative imprecision of the psychiatric methodology or the absence of substantial documentation, unless there are other reasons to question the diagnostic techniques.

*Blankenship v. Bowen*, 874 F.2d 1116, 1121 (6th Cir. 1989) (alterations in original) (quoting *Poulin v. Bowen*, 817 F.2d 865, 873-74 (D.C. Cir. 1987)).  In other words, for the ALJ to discount Dr. Litwin's opinion on the basis of his methodology, the ALJ had to articulate a basis for challenging Dr. Litwin's diagnostic techniques.  *Kester v. Astrue*, No. 3:07-cv-423, 2009 U.S. Dist. LEXIS 130637, at *26 (S.D. Ohio Jan. 14, 2009).  In Dr. Litwin's case, those diagnostic techniques included: (1) Weschler's Adult Intelligence Scale 4; (2) Brown's ADHD scales; (3) Wide Range Tests of Achievement; and (4) the SCL 90-R symptom checklist.  (Tr. 338-39). The ALJ's summary rejection of Dr. Litwin's opinion without discussing his diagnostic testing or identifying any flaw in his methodology renders his supportability explanation inadequate.

The ALJ's finding that Dr. Litwin's opinion was insufficiently specific is not relevant to the supportability of his opinion – because it doesn't challenge Dr. Litwin's supporting reasons – but the conclusion itself.  20 C.F.R. § 404.1520c(c)(1).  It could be relevant under "other factors," but that still leaves the ALJ's decision incomplete.  20 C.F.R. § 404.1520c(c)(5).  He

was required to explain how he considered consistency of Dr. Litwin's opinion with the rest of the evidence, but didn't do so.  20 C.F.R. § 404.1520c(b)(2).  In short, with Dr. Litwin's opinion too, the ALJ gave inadequate explanation for this court to make a meaningful review of his decision.  *Blakley*, 581 F.3d at 409.  And it fails to build an accurate and logical bridge between the evidence and the result.  *Fleischer*, 774 F. Supp. 2d at 877.  And the rejection of Dr. Litwin's opinion was not harmless.  As Todd has argued, the opinion of Dr. Sprout is consistent with the opinion of Dr. Litwin.  Thus, a rejection of Litwin's opinion has the collateral effect of undermining the consistency of the Sprout opinion, and vice versa.

Because the ALJ's discussion for why he found Dr. Litwin's opinion to be unpersuasive was inadequate, I recommend that this matter be remanded so that the ALJ can provide a more appropriate and detailed explanation as to why he found his opinion unpersuasive.

## IV.    Recommendation

Because the ALJ failed to apply proper legal standards in explaining why he found unpersuasive Dr. Sprout's and Dr. Litwin's opinions, I recommend that the Commissioner's final decision denying Todd's application for SSI be vacated and that Todd's case be remanded for further consideration.

Dated: June 3, 2021

Thomas M. Parker
United States Magistrate Judge

---

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See U.S. v. Walters,* 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn,* 474 U.S. 140 (1985), *reh'g denied,* 474 U.S. 1111 (1986).